# IN THE 21ST JUDICIAL CIRCUIT COURT, ST. LOUIS COUNTY, MISSOURI

| | |
|---|---|
| Judge or Division:<br>JOHN ROBERT LASATER | **Case Number: 24SL-CC03094** |
| Plaintiff/Petitioner:<br>BRIAN FINDER<br>vs. | Plaintiff's/Petitioner's Attorney/Address:<br>CHARLES NOAH INSLER<br>211 NORTH BROADWAY<br>SUITE 2700<br>ST LOUIS, MO 63102 |
| Defendant/Respondent:<br>AMC ENTERTAINMENT HOLDINGS INC. | Court Address:<br>ST LOUIS COUNTY COURT BUILDING<br>105 SOUTH CENTRAL AVENUE<br>CLAYTON, MO 63105 |
| Nature of Suit:<br>CC Other Tort | |

(Date File Stamp)

## Summons for Personal Service Outside the State of Missouri
### (Except Attachment Action)

**The State of Missouri to: AMC ENTERTAINMENT HOLDINGS INC.**
**Alias:**
**CORPORATE CREATIONS NETWORK IN** (700)
**4601 E. DOUGLAS AVE. #700**
**WICHITA, KS 67218**

*COURT SEAL OF*

*ST. LOUIS COUNTY*

**You are summoned to appear before this court and to file your pleading to the petition, copy of which is attached, and to serve a copy of your pleading upon the attorney for the Plaintiff/Petitioner at the above address all within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to file your pleading, judgment by default will be taken against you for the relief demanded in this action.**

**SPECIAL NEEDS: If you have special needs addressed by the Americans With Disabilities Act, please notify the Office of the Circuit Clerk at 314-615-8029, FAX 314-615-8739, email at SLCADA@courts.mo.gov, or through Relay Missouri by dialing 711 or 800-735-2966, at least three business days in advance of the court proceeding.**

**09-JUL-2024**
**Date**

Clerk

**Further Information:**
**AD**

### Officer's or Server's Affidavit of Service

I certify that:
1. I am authorized to serve process in civil actions within the state or territory where the above summons was served.
2. My official title is ____________________ of ____________________ County, ____________________ (state).
3. I have served the above summons by: (check one)

☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.

☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with ____________________, a person at least 18 years of age residing therein.

☐ (for service on a corporation) delivering a copy of the summons and a copy of the petition to ____________________ (name) ____________________ (title).

☐ other (describe) ____________________.

Served at ____________________ (address)
in ____________________ County, ____________________ (state), on ____________________ (date) at ____________________ (time).

____________________ Printed Name of Sheriff or Server

____________________ Signature of Sheriff or Server

**Subscribed and Sworn To** me before this ________ (day) ________ (month) ________ (year)

I am: (check one)
☐ the clerk of the court of which affiant is an officer.
☐ the judge of the court of which affiant is an officer.
☐ authorized to administer oaths in the state in which the affiant served the above summons. (use for out-of-state officer)
☐ authorized to administer oaths. (use for court-appointed server)

*(Seal)*

____________________ Signature and Title

**Service Fees, if applicable**

| | |
|---|---|
| Summons | $________________ |
| Non Est | $________________ |
| Mileage | $________________ (____________ miles @ $ ______ per mile) |
| **Total** | $________________ |

See the following page for directions to clerk and to officer making return on service of summons.

## Directions to Officer Making Return on Service of Summons

A copy of the summons and a copy of the motion and/or petition must be served on each Defendant/Respondent. If any Defendant/Respondent refuses to receive the copy of the summons and motion and/or petition when offered to him, the return shall be prepared to show the offer of the officer to deliver the summons and motion and/or petition and the Defendant's/Respondent's refusal to receive the same.

Service shall be made: (1) On Individual. On an individual, including an infant or incompetent person not having a legally appointed guardian, by delivering a copy of the summons and motion and/or petition to the individual personally or by leaving a copy of the summons and motion and/or petition at the individual's dwelling house or usual place of abode with some person of the family over 15 years of age, or by delivering a copy of the summons and motion and/or petition to an agent authorized by appointment or required by law to receive service of process; (2) On Guardian. On an infant or incompetent person who has a legally appointed guardian, by delivering a copy of the summons and motion and/or petition to the guardian personally; (3) On Corporation, Partnership or Other Unincorporated Association. On a corporation, partnership or unincorporated association, by delivering a copy of the summons and motion and/or petition to an officer, partner, or managing or general agent, or by leaving the copies at any business office of the Defendant/Respondent with the person having charge thereof or by delivering copies to its registered agent or to any other agent authorized by appointment or required by law to receive service of process; (4) On Public or Quasi-Public Corporation or Body. On a public, municipal, governmental or quasi-public corporation or body in the case of a county, to the mayor or city clerk or city attorney in the case of a city, to the chief executive officer in the case of any public, municipal, governmental, or quasi-public corporation or body or to any person otherwise lawfully so designated.

Service may be made by an officer or deputy authorized by law to serve process in civil actions within the state or territory where such service is made.

Service may be made in any state or territory in the United States. If served in a territory, substitute the word "territory" for the word "state."

The officer making the service must swear an affidavit before the clerk, deputy clerk, or judge of the court of which the person is an officer or other person authorized to administer oaths. This affidavit must state the time, place, and manner of service, the official character of the affiant, and the affiant's authority to serve process in civil actions within the state or territory where service is made.

Service must not be made less than ten days nor more than sixty days from the date the Defendant/Respondent is to appear in court. The return should be made promptly, and in any event so that it will reach the Missouri Court within 30 days after service.

# THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI

Twenty First Judicial Circuit

## NOTICE OF ALTERNATIVE DISPUTE RESOLUTION SERVICES

### Purpose of Notice

As a party to a lawsuit in this court, you have the right to have a judge or jury decide your case. However, most lawsuits are settled by the parties before a trial takes place. This is often true even when the parties initially believe that settlement is not possible. A settlement reduces the expense and inconvenience of litigation. It also eliminates any uncertainty about the results of a trial.

Alternative dispute resolution services and procedures are available that may help the parties settle their lawsuit faster and at less cost. Often such services are most effective in reducing costs if used early in the course of a lawsuit. Your attorney can aid you in deciding whether and when such services would be helpful in your case.

### Your Rights and Obligations in Court Are Not Affected By This Notice

You may decide to use an alternative dispute resolution procedure if the other parties to your case agree to do so. In some circumstances, a judge of this court may refer your case to an alternative dispute resolution procedure described below. These procedures are not a substitute for the services of a lawyer and consultation with a lawyer is recommended. Because you are a party to a lawsuit, you have obligations and deadlines which must be followed whether you use an alternative dispute resolution procedure or not. **IF YOU HAVE BEEN SERVED WITH A PETITION, YOU MUST FILE A RESPONSE ON TIME TO AVOID THE RISK OF DEFAULT JUDGMENT, WHETHER OR NOT YOU CHOOSE TO PURSUE AN ALTERNATIVE DISPUTE RESOLUTION PROCEDURE.**

### Alternative Dispute Resolution Procedures

There are several procedures designed to help parties settle lawsuits. Most of these procedures involve the services of a neutral third party, often referred to as the "neutral," who is trained in dispute resolution and is not partial to any party. The services are provided by individuals and organizations who may charge a fee for this help. Some of the recognized alternative dispute resolutions procedures are:

**(1) Advisory Arbitration:** A procedure in which a neutral person or persons (typically one person or a panel of three persons) hears both sides and decides the case. The arbitrator's decision is not binding and simply serves to guide the parties in trying to settle their lawsuit. An arbitration is typically less formal than a trial, is usually shorter, and may be conducted in a private setting at a time mutually agreeable to the parties. The parties, by agreement, may select the arbitrator(s) and determine the rules under which the arbitration will be conducted.

**(2) Mediation:** A process in which a neutral third party facilitates communication between the parties to promote settlement. An effective mediator may offer solutions that have not been considered by the parties or their lawyers. A mediator may not impose his or her own judgment on the issues for that of the parties.

(3) **Early Neutral Evaluation ("ENE"):** A process designed to bring the parties to the litigation and their counsel together in the early pretrial period to present case summaries before and receive a non-binding assessment from an experienced neutral evaluator. The objective is to promote early and meaningful communication concerning disputes, enabling parties to plan their cases effectively and assess realistically the relative strengths and weaknesses of their positions. While this confidential environment provides an opportunity to negotiate a resolution, immediate settlement is not the primary purpose of this process.

**(4) Mini-Trial:** A process in which each party and their counsel present their case before a selected representative for each party and a neutral third party, to define the issues and develop a basis for realistic settlement negotiations. The neutral third party may issue an advisory opinion regarding the merits of the case. The advisory opinion is not binding.

**(5) Summary Jury Trial:** A summary jury trial is a non binding, informal settlement process in which jurors hear abbreviated case presentations. A judge or neutral presides over the hearing, but there are no witnesses and the rules of evidence are relaxed. After the "trial", the jurors retire to deliberate and then deliver an advisory verdict. The verdict then becomes the starting point for settlement negotiations among the parties.

## Selecting an Alternative Dispute Resolution Procedure and a Neutral

If the parties agree to use an alternative dispute resolution procedure, they must decide what type of procedure to use and the identity of the neutral. As a public service, the St. Louis County Circuit Clerk maintains a list of persons who are available to serve as neutrals. The list contains the names of individuals who have met qualifications established by the Missouri Supreme Court and have asked to be on the list. The Circuit Clerk also has Neutral Qualifications Forms on file. These forms have been submitted by the neutrals on the list and provide information on their background and expertise. They also indicate the types of alternative dispute resolution services each neutral provides.

A copy of the list may be obtained by request in person and in writing to: Circuit Clerk, Office of Dispute Resolution Services, 7900 Carondelet Avenue, 5th Floor, Clayton, Missouri 63105. The Neutral Qualifications Forms will also be made available for inspection upon request to the Circuit Clerk.

The List and Neutral Qualification Forms are provided only as a convenience to the parties in selecting a neutral. The court cannot advise you on legal matters and can only provide you with the List and Forms. You should ask your lawyer for further information.

CCADM73

Electronically Filed - ST LOUIS COUNTY - July 02, 2024 - 02:29 PM

**IN THE CIRCUIT COURT OF ST. LOUIS COUNTY**
**STATE OF MISSOURI**

| | | |
|---|---|---|
| BRIAN FINDER, GABRIELLE DURHAM, N.F., a minor child proceeding through BRIAN FINDER, and A.F., a minor child proceeding through BRIAN FINDER,<br><br>Plaintiffs,<br><br>v.<br><br>AMC ENTERTAINMENT HOLDINGS, INC.,<br>Serve: Corporate Creations Network Inc.<br>4601 E. Douglas Avenue #700<br>Wichita, KS 67218<br><br>PRIME TIME TOYS, LLC<br>Serve: Joseph Pokowitz<br>4219 Hillsboro Road STE 321<br>Nashville, TN 37215<br><br>WALMART INC.,<br>Serve: CT Corporation System<br>320 S. Izard Street<br>Little Rock, AR 72201<br><br>JOHN DOE #1, and<br><br>JOHN DOE #2,<br>Serve: c/o AMC Theatres Creve Coeur 12<br>10465 Olive Boulevard<br>Saint Louis, MO 63141<br><br>Defendants. | ) | Cause No.:<br><br>Division<br><br>**JURY TRIAL DEMANDED** |

**PETITION FOR DAMAGES**

Plaintiffs Brian Finder, Gabrielle Durham, and N.F. and A.F., Brian Finder's minor children, file this Petition for Damages against Defendants AMC Entertainment Holdings, Inc. ("AMC"), Prime Time Toys, LLC, Walmart Inc., John Doe #1, and John Doe #2 ("Defendants"). The Petition alleges the following facts:

Electronically Filed - ST LOUIS COUNTY - July 02, 2024 - 02:29 PM

## INTRODUCTION

1. In one of its marquee advertisements, AMC touts its theaters as a "place for magic" with the accompanying promise that "We Make Movies Better."

2. This was not the experience of Brian Finder, Gabrielle Durham, N.F. or A.F. The Plaintiffs in this case did not experience the magic of AMC. Instead, the Plaintiffs endured a harrowing event, while attending a showing of *Inside Out 2*.

3. Towards the end of the movie, John Doe #1 stood up in the theater, put on a ski mask, pulled a gun from his backpack, and began shooting into the crowd, all the while yelling obscenities at members of the audience. Finder, Durham, and N.F. were all hit by the gun's gel beads.

4. In the moment that it was happening, the Plaintiffs feared for the lives, unaware that the gun was not a real gun. In the moment that it was happening, Finder attempted to shield his family from the gunman because, based on his military experience, real weapons can be painted by their users and there was no indication the gun at issue was fake.

5. After shooting several rounds of his gun, Doe #1 fled the theater. In his wake, he left an audience full of crying children and terrified adults.

6. This terrifying incident is not just attributable to John Doe #1. AMC bears responsibility for allowing John Doe #1 to enter the movie theater with a backpack containing a ski mask and gel bead gun. AMC bears responsibility for inadequately training and supervising its employees to identify the risk at issue.

7. John Doe #2, the manager of the AMC Creve Coeur 12, bears responsibility for allowing for allowing John Doe #1 to enter the movie theater with a backpack containing a ski mask and gel bead gun.

Electronically Filed - ST LOUIS COUNTY - July 02, 2024 - 02:29 PM

8. Prime Time Toys bears responsibility for designing and manufacturing a gel bead gun that is expressly made to resemble an automatic weapon, with features including an ammunition magazine and automatic and semi-automatic modes.

9. Walmart bears responsibility for being the "exclusive" retailer for selling a gel bead gun that is expressly made to resemble an automatic weapon.

10. The Plaintiffs bring this lawsuit against the Defendants to hold them responsible for the terror that they endured while trying to enjoy a Disney movie together as a family.

**PARTIES**

11. Plaintiff Brian Finder is a citizen of the State of Missouri and resides in St. Louis County, Missouri.

12. Plaintiff Gabrielle Durham is a citizen of the State of Missouri and resides in St. Louis County, Missouri.

13. Plaintiffs N.F. and A.F. are citizens of the State of Missouri and reside in St. Louis County, Missouri. Plaintiffs N.F. and A.F. are the children of Brian Finder and the step-children of Gabrielle Durham.

14. Defendant AMC Entertainment Holdings, Inc. is a Delaware Corporation with its principal place of business in Leawood, Kansas. From 1920 until 2011, AMC had maintained its headquarters in Kansas City, Missouri.

15. Defendant John Doe #2 is the manager of the AMC Creve Coeur 12. Defendant is a citizen of the State of Missouri.

16. Defendant Prime Time Toys, LLC is a New Jersey company with its principal place of business in Nashville, Tennessee.

Electronically Filed - ST LOUIS COUNTY - July 02, 2024 - 02:29 PM

17. Defendant Walmart Inc. is a Delaware Corporation with its principal place of business in Bentonville, Arkansas.

18. Defendant John Doe #1 is a citizen of the State of Missouri and resident of St. Louis County, Missouri. Upon his arrest, John Doe #1 was taken to St. Louis County Family Court.

## JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction. The Defendants are subject to personal jurisdiction in St. Louis County because the John Doe Defendants are citizens of Missouri and because the corporate Defendants have conducted substantial business activities in Missouri, cultivated a market for their goods and services in Missouri, and because this lawsuit arises out of these Missouri-based business activities. The exercise of personal jurisdiction over the Defendants does not offend due process.

20. Venue is proper in the Circuit Court of St. Louis County under Mo. Rev. §508.010.4 because the Plaintiffs were first harmed in St. Louis County.

## FACTS COMMON TO ALL COUNTS

### Plaintiffs Fear For Their Lives While Attending *Inside Out 2* at the AMC Creve Coeur 12

21. On Saturday, June 22, 2024, Brian Finder, Gabrielle Durham, N.F. and A.F. purchased tickets to see the Disney-Pixar movie *Inside Out 2* at the AMC Creve Coeur 12.

22. Midway through the movie, three, unaccompanied teenagers entered the movie theatre and began roaming around the few open seats. These three teenagers were allowed to remain in the theater, even though it was apparent that they were not there to watch the movie.

23. It is not currently known whether the teenagers purchased tickets to *Inside Out 2* or any other movie.

Electronically Filed - ST LOUIS COUNTY - July 02, 2024 - 02:29 PM

24. Towards the end of the movie, John Doe #1 stood up in the theater, put on a ski mask, and pulled a gun from his backpack.

25. When Finder began to sit up and shield his family, Doe #1 yelled an expletive at him and told him to sit down. Given Doe #1's reaction, Durham did not know whether the gun was real or fake.

26. In that moment, Durham's thoughts turned to the mass shooting in 2012 at the movie theater in Aurora, Colorado.

27. Doe #1 then began shooting into the crowd, all the while yelling obscenities at members of the audience.

28. When the shooting began, the Plaintiffs feared for the lives, unaware that the gun was not a real gun.

29. Gabrielle Durham was seven-months pregnant at the time of this incident.

30. When the shooting began, Finder attempted to shield his family from the gunman.

31. Based on Finder's military experience, real weapons can be painted by their users and there was no immediate indication whether the gun was real or fake.

32. Brian Finder, Gabrielle Durham, and N.F. were all struck by the fired gel beads. A.F. does not believe she was hit by the fired gel beads.

33. After shooting several rounds of his gun, Doe #1 fled the theater.

34. In his wake, he left an audience full of crying children and terrified adults.

35. Police caught Doe #1 in a nearby parking lot, arrested him, and took him to St. Louis County Family Court.

36. Police recovered the mask and gel bead gun, which was a Hydro Strike Pulsar Pro.

Electronically Filed - ST LOUIS COUNTY - July 02, 2024 - 02:29 PM



Credit: Creve Coeur Police Department

**AMC Failed to Deliver on Its Promises**

37. In the moment that Doe #1 pulled the gun from his backpack, Durham's thoughts immediately flashed to the mass shooting at a movie theater in Aurora, Colorado, a shooting in which the gunman killed 12 people and injured dozens more.

38. After the Colorado shooting, AMC issued a statement, in which it promised its customers that it would not "permit face-covering masks or fake weapons inside our buildings."

39. In the years that have followed, AMC has touted its theaters as a "place for magic" with the accompanying promise that "We Make Movies Better."

40. The Plaintiffs in this case did not experience the magic of AMC. Instead, the Plaintiffs endured a terrifying and traumatic event, while attending a showing of *Inside Out 2*.

41. This terrifying experience was the direct result of AMC's failure to adequately secure its movie theaters, failure to adequately train and supervise its employees, and failure to identify the risk at issue.

42. Wallace Bell was in the theater with his two sons, 12, and 6. According to news reports, he was also hit with one of the projectiles. In the news report, Bell expressed his frustration

Electronically Filed - ST LOUIS COUNTY - July 02, 2024 - 02:29 PM

over the lack of security, noting that no security personnel were present at the time of the incident. Bell finished by staying this "all happened because of lack of security and judgment."

43. Police confirmed that Doe #1 had entered the movie theater with a backpack.

44. This terrifying experience was also the result of AMC's failure to have adequate policies in place. The shooting happened around 5:30 p.m. on Saturday. Upon information and belief, AMC Creve Coeur 12 has a policy barring anyone under 18 from being on the premises without a parental guardian after 6:00 p.m.

45. AMC's failings could have also resulted in harm to John Doe #1.

46. Lt. Jon McIntosh, a Creve Coeur police information officer, was quoted saying the day could have ended in tragedy. "When anybody does something like this, it puts many people at risk because any bystander in the theater may be (carrying a concealed gun) and can see that as a threat," McIntosh said. "In a dark theater, we don't know what kind of gun the person is holding."

47. John Doe #2, the manager of the AMC Creve Coeur 12, failed to prevent John Doe #1 from entering the theater showing *Inside Out 2,* even though Doe #1 was wearing a large backpack and was unaccompanied by any parent.

48. John Doe #2 failed to escort John Doe #1 from the theater showing *Inside Out #2,* even though he entered the theater midway through the movie and was roaming around the theater without any intent to watch the movie.

49. This was not the first incident involving the AMC Creve Coeur 12.

50. In January 2015, Ned R. Booker was shot to death right outside of the AMC Creve Coeur 12. The shooting left the front doors of the AMC riddled with bullet holes and markings.

Electronically Filed - ST LOUIS COUNTY - July 02, 2024 - 02:29 PM

**Prime Time Toys Designs Toy Guns that Are Dangerously Similar to Real Guns**

51. Prime Time Toys designs and manufactures the Hydro Strike Pulsar Pro, the gel bead gun that was used to terrify the Plaintiffs and audience members of the *Inside Out 2* showing.

52. Prime Time Toys bears responsibility for designing and manufacturing a gel bead gun that is expressly made to resemble an automatic weapon, with features including an ammunition magazine and automatic and semi-automatic modes.

53. The design of these guns is negligent and dangerous, with the gel bead guns appearing dangerously similar to real weapons.

54. The Creve Coeur police spokesman identified these concerns. In news reports, Lt. Jon McIntosh stressed that "these types of toy guns are not toys and we really need people to think before they allow their kids to, quote, 'play' with these types of things. This really could've ended in tragedy."

55. These gel bead guns have, in fact, produced tragedies.

56. In July 2022, an off-duty New York City corrections officer shot and killed an 18-year old who had recently fired a gel bead gun at the officer from a car.

57. In April 2024, a man in Richmond, Kentucky used a revolver to shoot at kids who had recently fired a gel bead gun at him.

58. In June 2024, a man in Wichita, Kansas shot and paralyzed a teenager, who had recently fired a gel bead gun at his daughter.

59. These tragedies are among the most egregious examples, but they are not exhaustive.

60. Indeed, the gel bead guns have been used to terrorize innocent bystanders around the country.

Electronically Filed - ST LOUIS COUNTY - July 02, 2024 - 02:29 PM

61. Fueled by a TikTok trend, named the OrbeezChallenge, these gel bead guns have been creating public nuisances around the country, with cities and police departments warning of a "zero tolerance" policy towards the guns.

62. The Orbeez Challenge usually involves users of the gel bead guns shooting at random bystanders. These shootings have injured the innocent bystanders and members of the public.

63. Given the Hydro Strike Pulsar Pro's similarities to a real automatic weapon, it was reasonably foreseeable that teenagers would be enticed to use the Hydro Strike in a dangerous and unsafe manner.

**Walmart is the Exclusive Seller of The Pulsar Pro**

64. According to the Gel Zone Pro website, Walmart is the exclusive seller of the Hydro Strike Pulsar Pro:




*Hydro Strike Pulsar Pro*

$85.99

- Includes 1 Hydro Strike Pulsar Pro Gel Bead Blaster, 5,000 Gel-Tek beads, Hydro Strike protective eyewear, and a Gel-Tek bead storage container
- Gel-Tek beads splash on impact for blaster action without the cleanup
- Hydrate Gel-Tek beads in water for 4 hours for optimum results.
- Features full-auto and semi-auto modes, 2 sights, and an adjustable shoulder stock.
- The bright, neon design brings style to the gel bead blaster field.
- Gel-Tek beads are compatible with most standard water bead blasters.
- Recommended for ages 14+
- Available exclusively at Walmart and

BUY ONLY AT WALMART

Category:

- Available exclusively at Walmart and Walmart.com.

BUY ONLY AT WALMART

65. Walmart is still selling the Hydro Strike Pulsar Pro:

Electronically Filed - ST LOUIS COUNTY - July 02, 2024 - 02:29 PM




66. Walmart is still selling the Hydro Strike Pulsar Pro even though police departments and municipalities have issued "zero tolerance" warnings about the use of these gel bead guns.

67. Walmart bears responsibility for being the "exclusive" retailer for selling a gel bead gun that is expressly made to resemble an automatic weapon and serving as the exclusive means for the Hydro Strike Pulsar Pro to make its way into the hands of Doe #1.

**COUNT I**
**NEGLIGENCE**
**(ALL PLAINTIFFS AGAINST AMC ENTERTAINMENT HOLDINGS, INC.)**

68. Plaintiffs incorporate by reference each of the above paragraphs.

69. Plaintiffs purchased tickets to see *Inside Out 2* at the AMC Creve Coeur 12.

70. AMC owed the Plaintiffs and its customers a duty to provide a safe and secure environment for watching movies.

71. AMC knew, or had reason to know, that John Doe #1 was reasonably likely to commit a crime in the theatre showing *Inside Out 2*. John Doe #1 entered the AMC with a large backpack and unaccompanied by any parental guardian. John Doe #1, a teenager, then went into the movie, midway through the film, without any intent to watch the movie.

Electronically Filed - ST LOUIS COUNTY - July 02, 2024 - 02:29 PM

72. Sufficient time existed for AMC to prevent Doe #1's criminal actions. Doe #1 entered the theatre midway though the movie, but did not begin threatening and shooting the audience members until the film was nearly finished.

73. AMC was aware of previous criminal behavior around its theatres, including the shooting in January 2015.

74. AMC breached its duty of care.

75. AMC breached this duty of care by:

a. negligently failing to secure its movie theatres;

b. failing to adequately train and supervise its employees to identify or prevent reasonably foreseeable criminal activity;

c. failing to provide adequate security for its customers;

d. failing to have a security guard on the property at time of the incident;

e. failing to have sufficient policies in place to prevent unaccompanied minors from entering the theatres;

f. allowing Doe #1 to enter the movie theatre with a backpack, unaccompanied by a parental guardian, with several indications he had no intention of seeing a movie;

g. and allowing Doe #1 to remain in the movie theatre, while roaming around the theatre for a significant period of time, without intervening or investigating the situation.

76. AMC's breach of this duty proximately caused the Plaintiffs' damages.

77. The Plaintiffs suffered emotional distress and damages as a direct result of AMC's negligence.

Electronically Filed - ST LOUIS COUNTY - July 02, 2024 - 02:29 PM

**COUNT II**
**NEGLIGENT TRAINING AND SUPERVISION**
**(ALL PLAINTIFFS AGAINST AMC ENTERTAINMENT HOLDINGS, INC.)**

78. Plaintiffs incorporate by reference each of the above paragraphs.

79. AMC owed the Plaintiffs and its customers a duty to provide a safe and secure environment for watching movies.

80. AMC owed a duty to Plaintiffs and others to exercise reasonable care in training and supervising its employees.

81. AMC failed to exercise reasonable care in providing training and supervision to its employees, including on security measures. This was evident in the fact that AMC employees:

a. allowed John Doe #1 to enter the AMC with a large backpack and unaccompanied by any parental guardian;

b. allowed John Doe #1, a teenager, to enter a children's movie, midway through the film, with several indications he had no intention of seeing a movie;

c. allowed John Doe #1 to remain in the theatre for a significant period of time without intervening or investigating the situation; and

82. The Plaintiffs suffered emotional distress and damages as a direct result of AMC's carelessness and negligent training and supervision of its employees.

**COUNT III**
**NEGLIGENCE**
**(ALL PLAINTIFFS AGAINST PRIME TIME TOYS, LLC)**

83. Plaintiffs incorporate by reference each of the above paragraphs.

84. Defendant Prime Time Toys owed the public, including the Plaintiffs, a duty to exercise reasonable care in designing, manufacturing, marketing, supplying, or otherwise

Electronically Filed - ST LOUIS COUNTY - July 02, 2024 - 02:29 PM

distributing and placing in the stream of commerce the Hydro Strike Pulsar Pro at issue in this lawsuit.

85. Prime Time Toys sells and distributes the Hydro Strike Pulsar Pro in the regular course of its business throughout the United States, including into Missouri.

86. Prime Time Toys failed to exercise ordinary care, thereby breaching its duty to Plaintiffs, by designing and marketing a "toy" gun for teenagers, even while designing the gun in a manner that made it dangerously similar to real, automatic weapons.

87. By designing and marketing a "toy" gun that is dangerously similar to real, automatic weapons, Prime Time Toys knew, or should have known, that its product would be used in an unsafe, threatening, and dangerous manner.

88. The Hydro Strike Pulsar Pro's packaging boasts its "2 SIGHTS," "FULL-AUTO & SEMI AUTO MODES" and an exit velocity of 200 Feet Per Second.

89. The Hydro Strike Pulsar Pro resembles an AR-15, which also features a triangular buttstock, a pistol grip, and a curved magazine:





Electronically Filed - ST LOUIS COUNTY - July 02, 2024 - 02:29 PM

90. The Hydro Strike Pulsar Pro was used to terrorize the Plaintiffs and other movie goers on June 22. This was a reasonably foreseeable use of the gun.

91. Indeed, the Hydro Strike Pulsar Pro has been used to terrorize countless other victims as part of a national social media trend, in which users randomly attack strangers with the gel bead blasters, often in a "drive-by" manner.

92. The "fully automatic" nature of the gun lends itself to this type of drive-by menace.

93. The Plaintiffs suffered emotional distress and damages as a direct result of Prime Time Toys' negligence.

**COUNT IV**
**STRICT PRODUCTS LIABILITY**
**(ALL PLAINTIFFS AGAINST PRIME TIME TOYS, LLC)**

94. Plaintiffs incorporate by reference each of the above paragraphs.

95. Prime Time Toys designs, manufactures, markets, sells and distributes the Hydro Strike Pulsar Pro in the regular course of its business.

96. At the time of the incident, and well before the incident, the Hydro Strike Pulsar Pro was in a defective condition and was unreasonably dangerous.

97. The Hydro Strike Pulsar Pro was in a defective condition because its design and marketing encouraged its users to use the product in an unsafe, threatening, and dangerous manner.

98. The Hydro Strike Pulsar Pro's packaging boasts its "2 SIGHTS," "FULL-AUTO & SEMI AUTO MODES" and an exit velocity of 200 Feet Per Second.

99. The Hydro Strike Pulsar Pro resembles an AR-15, which also features a triangular buttstock, a pistol grip, and a curved magazine.

100. The Hydro Strike Pulsar Pro was used to terrorize the Plaintiffs and other movie goers on June 22. This was a reasonably foreseeable use of the gun.

Electronically Filed - ST LOUIS COUNTY - July 02, 2024 - 02:29 PM

101. Indeed, the Hydro Strike Pulsar Pro has been used to terrorize countless other victims as part of a national social media trend, in which users randomly attack strangers with the gel bead blasters, often in a "drive-by" manner.

102. The "fully automatic" nature of the gun and its overall design lends itself to this type of drive-by menace and was a reasonably foreseeable use of the gun.

103. The Hydro Strike Pulsar Pro does not contain adequate warnings.

104. The warnings that do accompany the gun are insufficient. For instance, the box states that adult supervision is required, but it is reasonably foreseeable that teenagers would not be using this gun with adult supervision, making the gun all the more dangerous in the hands of unsupervised kids and teenagers.




105. The Plaintiffs suffered emotional distress and damages as a direct result of Prime Time Toys' negligent design, manufacture, marketing, and sale of the Hydro Strike Pulsar Pro.

## COUNT V
## STRICT PRODUCTS LIABILITY
## (ALL PLAINTIFFS AGAINST WALMART INC.)

106. Plaintiffs incorporate by reference each of the above paragraphs.

107. Walmart is the exclusive retailer of the Hydro Strike Pulsar Pro.

108. Walmart is engaged in the business of selling products, like the Hydro Strike Pulsar Pro, for use by consumers.

109. Anyone who sells a product in a defective condition, unreasonably dangerous to the user or consumer, is subject to liability for injury caused by the defect.

110. Walmart sold the Hydro Strike Pulsar Pro even though the gun was in a defective condition and unreasonably dangerous to the public at the time of sale.

Electronically Filed - ST LOUIS COUNTY - July 02, 2024 - 02:29 PM

111. At the time of the incident, and well before the incident, the Hydro Strike Pulsar Pro was in a defective condition and was unreasonably dangerous.

112. The Hydro Strike Pulsar Pro was in a defective condition because its design and marketing encouraged its users to use the product in an unsafe, threatening, and dangerous manner.

113. The Hydro Strike Pulsar Pro's packaging boasts its "2 SIGHTS," "FULL-AUTO & SEMI AUTO MODES" and an exit velocity of 200 Feet Per Second.

114. The Hydro Strike Pulsar Pro resembles an AR-15, which also features a triangular buttstock, a pistol grip, and a curved magazine.

115. The Hydro Strike Pulsar Pro was used to terrorize the Plaintiffs and other movie goers on June 22. This was a reasonably foreseeable use of the gun.

116. Indeed, the Hydro Strike Pulsar Pro has been used to terrorize countless other victims as part of a national social media trend, in which users randomly attack strangers with the gel bead blasters, often in a "drive-by" manner.

117. The "fully automatic" nature of the gun and its overall design lends itself to this type of drive-by menace and was a reasonably foreseeable use of the gun.

118. The Hydro Strike Pulsar Pro does not contain adequate warnings.

119. The warnings that do accompany the gun are insufficient. For instance, the box states that adult supervision is required, but it is reasonably foreseeable that teenagers would not be using this gun with adult supervision, making the gun all the more dangerous in the hands of unsupervised kids and teenagers.

120. The Plaintiffs suffered emotional distress and damages as a direct result of Walmart's marketing, distribution, and sale of the Hydro Strike Pulsar Pro.

Electronically Filed - ST LOUIS COUNTY - July 02, 2024 - 02:29 PM

**COUNT VI**
**VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT**
**(ALL PLAINTIFFS AGAINST AMC ENTERTAINMENT HOLDINGS, INC.)**

121. Plaintiffs incorporate by reference each of the above paragraphs.

122. Plaintiffs purchased tickets to see *Inside Out 2* at the AMC Creve Coeur 12.

123. Plaintiffs purchased the tickets for personal or family use.

124. Plaintiffs suffered an ascertainable loss of money because they did not receive the movie-going experience that they bargained for.

125. Plaintiffs did not receive the movie-going experience they bargained for as a result of AMC's unlawful acts and practices.

126. An unfair practice is any practice that either offends any public policy or is unethical, oppressive, or unscrupulous and presents a risk of, or causes, substantial injury to consumers.

127. Proof of deception, fraud, or misrepresentation is not required to prove an unfair practice.

128. The fundamental purpose of the Missouri Merchandising Practices Act (MMPA) is the protection of consumers. The statute is a form of paternalistic legislation designed to protect those who cannot otherwise protect themselves.

129. AMC engaged in unfair practices by marketing and selling its movie-going experience as "a place for magic," knowing that its theatres lacked adequate security for its customers, its theatres had insufficient policies in place for the protection of its customers, and its theatres had not adequately trained or supervised its employees to identify and address security risks.

Electronically Filed - ST LOUIS COUNTY - July 02, 2024 - 02:29 PM

130. The Plaintiffs suffered emotional distress and damages as a direct result of AMC's violations of the MMPA.

131. The Plaintiffs are entitled to an award of attorneys' fees under the MMPA.

**COUNT VII**
**NEGLIGENCE**
**(ALL PLAINTIFFS AGAINST JOHN DOE #2)**

132. Plaintiffs incorporate by reference each of the above paragraphs.

133. Plaintiffs purchased tickets to see *Inside Out 2* at the AMC Creve Coeur 12.

134. John Doe #2 was the manager of the AMC Creve Coeur 12 at the time of the incident.

135. John Doe #2 owed the Plaintiffs a duty to provide a safe and secure environment for watching movies.

136. John Doe #2 knew, or had reason to know, that John Doe #1 was reasonably likely to commit a crime in the theatre showing *Inside Out 2*. John Doe #1 entered the AMC with a large backpack and unaccompanied by any parental guardian. John Doe #1, a teenager, then went into the movie, midway through the film, without any intent to watch the movie.

137. Sufficient time existed for John Doe #2 to prevent Doe #1's criminal actions. Doe #1 entered the theatre midway though the movie, but did not begin threatening and shooting the audience members until the film was nearly finished.

138. John Doe #2 was aware of previous criminal behavior around the theatre.

139. John Doe #2 breached his duty of care by:

a. negligently failing to secure the movie theatres;

Electronically Filed - ST LOUIS COUNTY - July 02, 2024 - 02:29 PM

b. failing to adequately train and supervise the employees under his control so that they could adequately identify or prevent reasonably foreseeable criminal activity;

c. failing to provide adequate security for customers;

d. failing to have a security guard on the property at time of the incident;

e. failing to have sufficient policies in place to prevent unaccompanied minors from entering the theatres;

f. allowing Doe #1 to enter the movie theatre with a backpack, unaccompanied by a parental guardian, with several indications he had no intention of seeing a movie;

g. and allowing Doe #1 to remain in the movie theatre, while roaming around the theatre for a significant period of time, without intervening or investigating the situation.

140. John Doe #2's breach of his duty proximately caused the Plaintiffs' damages.

141. The Plaintiffs suffered emotional distress and damages as a direct result of Doe #2's negligence.

**<u>COUNT VIII</u>**
**<u>BATTERY</u>**
**<u>(FINDER, DURHAM, AND N.F. AGAINST JOHN DOE #1)</u>**

142. Plaintiffs incorporate by reference each of the above paragraphs.

143. John Doe #1 fired and struck Finder, Durham, and N.F. with his gel bead gun, with the intent to do so during the showing of *Inside Out 2*.

144. N.F. was struck in the face and Finder and Durham were struck on their bodies.

Electronically Filed - ST LOUIS COUNTY - July 02, 2024 - 02:29 PM

145. The Plaintiffs Finder, Durham, and N.F. suffered emotional distress and damages as a direct result of Doe #1's battery.

**COUNT IX**
**ASSAULT**
**(A.F. AGAINST JOHN DOE #1)**

146. Plaintiffs incorporate by reference each of the above paragraphs.

147. John Doe #1 fired and struck Finder, Durham, and N.F. with his gel bead gun, with the intent to do so during the showing of *Inside Out 2*.

148. A.F. was next to Finder, Durham, and N.F. when they were struck, and feared she too would be hit with projectiles from the gel bead gun.

149. A.F. suffered emotional distress and damages as a direct result of Doe #1's assault.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all counts so triable.

**PRAYER FOR RELIEF**

WHEREFORE Plaintiffs pray that this Court enter a judgment in their favor and against Defendants on all counts; award Plaintiffs damages in an amount to be established at trial, in an amount in excess of $25,000; award Plaintiffs pre-judgment interest as appropriate; award Plaintiffs post-judgment interest; award Plaintiffs their costs and attorneys' fees incurred in having to bring this lawsuit; and award such further and other relief as this Court deems just and proper.

Electronically Filed - ST LOUIS COUNTY - July 02, 2024 - 02:29 PM

Dated: July 2, 2024

Respectfully submitted,
HEPLERBROOM LLC

By: /s/ *Charles N. Insler*
Thomas Magee #32871
Charles N. Insler #58623
701 Market Street, Suite 1400
St. Louis, MO 63101
T: 314.241.6160
F: 314.241.6116
thomas.magee@heplerbroom.com
charles.insler@heplerbroom.com

*Attorneys for Plaintiffs*